UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

GARY LOTT                                                    PLAINTIFF

v.                                           CIVIL ACTION NO. 2:16-cv-96-KS-MTP

BRIAN J ADKISON and MARK E.                              DEFENDANTS
MACK,


**MEMORANDUM IN SUPPORT OF MOTION TO STRIKE TOXICOLOGY
TESTIMONY AND TO EXCLUDE POST-MORTEM EVIDENCE OF
MEDICATIONS**


A party proffering an expert witness has the burden of establishing the elements

that render the testimony admissible. FED. R. EVID. 702, Advisory Committee Notes;

*West* v. *Drury Co.,* Civil Action No. 2:07CV215-P-A, 2009 U.S. Dist. LEXIS 56082, at

*3-4 (N.D. Miss. Jun. 5, 2009).  Defendants fall well short of this standard, and thus their

toxicology report and expert witness must be stricken.  Moreover, all mentions of any

medication (other than blood pressure medication) found in a post-mortem blood analysis

should be excluded.

I.    **RELEVANT FACTS.**

The collision in this matter occurred when a fully loaded semi-truck collided head

on in the oncoming lane with a car being driven by Mrs. Donna Lott, who died on impact.

The evidence shows that Mrs. Lott had been swerving into the oncoming (northbound lane)

prior to the collision.  When the trucker crested a hill, he saw Mrs. Lott in his lane (the

northbound lane).  Even though he could have safely pulled his vehicle off the road to the

right, he decided to pull his fully loaded truck into the oncoming southbound lane.

However, Mrs. Lott had managed to get her vehicle back into her own lane.  If the truck

driver had stayed in his own lane and maintained control of his vehicle, the collision would not have happened.  If the truck driver had pulled his vehicle to the right, the collision would not have happened.  Also, there was substantial traffic behind Mrs. Lott in the southbound lane, a semi-truck followed by two cars and another semi-truck; thus, even if the southbound lane was clear of Mrs. Lott at the time of the collision, it was not clear of other vehicles and did not in any respect represent a safe option for the defendant.

There is no evidence as to Mrs. Lott's driving on the way to the store, or on the way back from the store until a truck driver named Brian Pelto caught up with her.  Mr. Pelto testified that he was in sight of her as much as a minute before he began to pass her.  Pelto dep., 31:14-32:4.  In that time period that he was behind her and making the decision to pass her, Mr. Pelto did not "see anything about her driving at all that concerned" him.  Pelto dep., 32:5-9.  He agreed in his testimony that "[s]he wasn't swerving or weaving in her lane at that point."  Pelto dep., 35:10-12.  It was only when he pulled around and go to the point that the front of his truck was about at her driver's side door that he noticed her moving toward him.  Pelto dep., 35:13-19.  "And she started drifting over there to me, so I just backed off.  I hit my brakes and backed off and that's when she started going from one side to the other."  Pelto dep., 33:15-19.  Mr. Pelto made it clear that until he pulled his semi up even with her, he did not notice any swerving at all:

> Q.  It did seem to start up kind of suddenly though from what you're describing. Is that fair to say?
>
> A.  Well, from whenever she pulled over on me and I backed off, it started then. I don't know from that point -- how she made it as far as she did, I don't know. I don't know where she come from.
>
> Q.  But in the time before you got the front of your truck even with her rear driver's side door, prior to that time you didn't see her moving back and forth in the lane?

    A. No.

Pelto dep.

Mr. Pelto later called 911, and from the time that he did so until the collision was "[t]en

minutes maybe, at the most."  During that entire period of time, from when he called 911

until the collision occurred, Mrs. Lott was weaving back and forth:

> Q. So over a long period of time. From the time you
> called 911 until the time that the collision occurred,
> was there ever a period of time where she was driving
> normally or was she weaving and swaying back and
> forth the entire time?
>
> A. About the whole time, sure enough, yeah. I'd say the
> whole time. She was running folks off the road. She
> would go slam in the grass on one side and then go
> slam in the grass on the other side. It's a wonder that
> some them didn't hit her. If they hadn't been stopping
> and moving over, they probably would have.

Pelto dep. 36:11-23.

   The evidence thus is that Mrs. Lott was driving normally during her trip until

something suddenly happened that caused her to begin swerving massively across the road,

all of the way from the grass on one side to the grass on the other.  The facts are thus

entirely consistent with the onset of a medical condition for which Mrs. Lott cannot be

faulted.  Mr. Lott testified that his wife had blood pressure problems for which she took

medication, and took cough syrup that he had to sign for at the drug store.  Gary Lott dep.,

24:9-14.  He testified that once when she was riding with him, she complained about being

dizzy headed:

> Q. Had she ever complained to you about -- you know,
> just saying, "I haven't felt very well  lately and have a
> little difficulty concentrating  or staying in my lane"?
>
> A. There was one time she was riding with  me -- which I
> done most of the driving -- and she  was saying she
> was kind of dizzy headed. I don't  know if it was from

> her blood pressure or the cough medicine or what. I
> don't know.

Gary Lott dep., 34:23-35:6.  He also testified that her dizziness concerned him with regards

to driving his truck:

> Q.  Were you also concerned about her dizziness or
>      health?
>
> A.  The dizziness part, yeah, because, like I said, I'm miles
>      away. I did not know if she might have had a dizzy
>      spell, and I knew she would be walking across the
>      street to take care of him.

Gary Lott dep., 44:25-45:6.  Mr. Lott testified at length that he was concerned about her

dizziness, and that Mrs. Lott ascribed her dizziness to her blood pressure:

> Q.  What would she say when she had these dizzy spells
>      that she thought was happening?
>
> A.  <u>Just blood pressure dropping or going up too high at
>      times</u>.
>
> Q.  Did she ever tell you she thought it was related to any
>      medications?
>
> A.  No, sir.

The requirement that expert testimony "assist the trier of fact to understand the

evidence or determine a fact in issue" captures the relevancy inquiry to be made by the

Court, as gatekeeper. *West,* 2009 US. Dist. LEXIS 56082, at * 4-5 (citing FED. R. EVID.

702); *Wilson* v. *Muckala,* 303 F. 3d 1207,1219 (loth Cir. 2002) ("The 'touchstone' of

admissibility of expert testimony is its helpfulness to the trier of fact."). To ascertain

relevance, the Court must consider whether "expert testimony proffered in the case is

sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."

*Daubert,* 509 US. at 591.  As shown below, the toxicology report omits relevant facts

regarding Mrs. Lott's blood pressure problems.  At the same time, the report glosses over

a glaring lack of data concerning the amount of medications in her bloodstream at the time

of the collision.  For these reasons, the testimony of the toxicologist cannot assist the trier of fact, and does not meet the standards for admissibility.

## II.   DEFENDANT WISHES TO COUNTER CLEAR EVIDENCE OF MRS. LOTT'S BLOOD PRESSURE PROBLEMS WITH A TOXICOLOGY REPORT CHARGING HER WITH ILLICIT USE OF MORPHINE.

The above-quoted testimony of Mr. Pelto and Mr. Lott gives us very strong evidence that Mrs. Lott's swerving was the result of her blood pressure "dropping or going up too high" while she was driving on the day of the collision.  The onset of her swerving was sudden – for the minute or so that Mr. Pelto saw her before he started to pass her and up until the time he was even with her, there was nothing at all about her driving that concerned him.  Yet, from that point forward, there was never a time that she was not swerving, and her swerving went on for about ten minutes.  This is entirely consistent with Mr. Lott's testimony about his wife's dizziness and other evidence showing that she was on medication for hypertension.

Defendant, however, seeks to show that Mrs. Lott was driving under the influence of drugs that caused her to be "severely impaired."  Defendant offers up no medical or toxicological explanation for when this severe impairment began or why the onset was so sudden.  Instead, defendant offers up a very flawed report by a toxicologist who concludes Mrs. Lott was "severely impaired" because she a post-mortem analysis of her blood showed the presence of five medications (six if one includes caffeine).  However, the report also admits that the post-mortem analysis of Mrs. Lott's blood cannot tell us how much of any drug was in her system at the time of the collision, which is the only relevant time period.  For all of the reasons set forth below, the report and any testimony by the toxicologist must be stricken.

**III.    THE TOXICOLOGIST'S TESTIMONY IS INADMISSIBLE BOTH UNDER THE RULES OF EVIDENCE AND UNDER THE DAUBERT DECISION.**

The central finding of the toxicologist's report is that "the medications that Ms. Lott had in her system and the description of her driving on May 23, 2016 demonstrate that she was severely impaired for driving an automobile at the time of the motor vehicle collision that claimed her life."  Exhibit 1 p. 6.  Besides the fact that the report's central opinion is actually a legal conclusion ("severely impaired for driving" is a legal conclusion, not a toxicological one), the report contradicts its eventual conclusion by first admitting that there is no way to calculate her drug levels (and thus her impairment) while she was still alive.

We bring this motion both under the Rules of Evidence and under the Daubert decision.[1]  Rule 702 was amended in 2000 in response to *Daubert* and *Kumho Tire*. The rule now provides that an expert may testify if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  In *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court set forth the District Court's "gatekeeping" function for reviewing and either allowing or disallowing expert testimony. *Daubert* challenges fall into three (3) general categories – qualifications, reliability and relevance:

> First is a challenge of the expert's *qualifications*, since Fed.R.Evid. 702 requires "scientific, technical, or specialized knowledge…[from an expert witness who is qualified because of his] knowledge, skill, experience, training, or education…" *Id*. Second, the *reliability* of the

---

[1] Our evidentiary objections can be made in our motions in limine, however our objections under Daubert are subject to the May 26, 2017 motions deadline.

> expert's testimony may be challenged for a failure to
> employ "the same level of intellectual rigor that
> characterizes the practice of an expert in the relevant field."
> [Citations omitted].  Third is a challenge of the *relevance*
> of the expert's opinions. *Id*. (citing Fed.R.Evid. 702;
> *Pipitone*, 288 F.3d at 245). To assist the jury in its
> determination, the testimony must "fit" the facts of the
> case, *i.e*., there must be "a valid connection between the
> expert testimony and the pertinent inquiry." [Citations
> omitted].

*Knox v. Ferrer*, 2008 WL 4411326 at *2 (S.D.Miss.Sept. 22, 2008). We are not challenging the toxicologist's training or experience in toxicology, but we do challenge his qualifications to render the opinions in his report.  As discussed below, some of his opinions are outside of the realm of toxicology and therefore must be stricken under Daubert.  On its face, the toxicologist's report shows that his opinions are not based on sufficient facts or data.  Moreover, the proposed testimony is not helpful to the trier of fact. The toxicologist gives the opinion that Mrs. Lott was "severely impaired," without defining what "impaired" means in this context and what "severely impaired" means.

Under *Daubert,* the trial judge, in exercising his gatekeeping function, determines whether the prof erred expert testimony (1) is scientifically valid, and (2) will assist the trier of fact to understand or determine a fact in issue. *Daubert,* 509 US. at 592. The first prong of the inquiry focuses on whether the evidence is sufficiently reliable, while the second prong is focused on relevance. *Id* at 590-591.  The toxicologist's report fails under either prong.

   A. **Because "[d]rug concentrations increase after death due to changes in blood pH and drugs redistributing from tissues to blood, a process known as postmortem redistribution," it is not possible to calculate the concentrations of drugs in Donna Lott's bloodstream at the time of the collision.**

The most glaring problem is found in the toxicologist's admission that "it is not

possible to directly compare postmortem drug concentrations to concentrations obtained on living individuals to an exact certainty" and "[d]rug concentrations increase after death due to changes in blood pH and drugs redistributing from tissues to blood, a process known as postmortem redistribution."  Nothing stated in the report after this point can possibly be deemed to be based upon sufficient facts or data, or the result of reliable principles and methods applied to the facts of this case.

The toxicologist thus admits at the outset that he has no way of knowing what the concentrations of the various substances were at the time of the collision, which is the only relevant time period.  If the concentrations were locked in place by Mrs. Lott's unfortunate death, then the toxicologist could have provided relevant data.  However, since this is admittedly not the case, we are left with the following data:

| DRUG | POST-MORTEM CONCENTRATION | CONCENTRATION AT TIME OF COLLISION | EFFECT ON DONNA LOTT WHILE DRIVING |
|---|---|---|---|
| Caffeine | "positive" | UNKNOWN | UNKNOWN |
| Clonazepam | 6.8 ng/mL | UNKNOWN | UNKNOWN |
| 7-Aminoclonazepam | 65 ng/mL | UNKNOWN | UNKNOWN |
| Morphine | free 73 ng/mL | UNKNOWN | UNKNOWN |
| Chlorpheniramine | 57 ng/mL | UNKNOWN | UNKNOWN |
| Dextro/Levo Methorphan | 70 ng/mL | UNKNOWN | UNKNOWN |

"For proffered expert testimony 'to qualify as scientific knowledge, an inference or assertion must be derived by the scientific method." *Camp* v. *LockheedMartin Corp.,* Civil Action No. H-97-1938, 1998 U.S. Dist. LEXIS 20750, at *7 (S.D. Tex. Dec. 29, 1998). The toxicologist has not shown any scientific method whereby he could calculate the concentrations of drugs in Mrs. Lott's bloodstream <u>at the time of the collision</u>, indeed he

has disclaimed that it is possible.  He has posted no scientific method for correlating Mrs. Lott's weaving on the roadway with the amounts of drugs found in her system post-mortem.  His testimony therefore does not qualify as scientific knowledge, and must be stricken.

Furthermore, even for the irrelevant post-mortem concentrations, the report does not provide important data needed to apply that data to the facts of the case.  For example, the report states that the post-mortem concentration of morphine was "free 73 ng/mL" and that "[t]he median morphine concentration in the blood of impaired drivers in Sweden was 30 ng/mL."  However, the report fails to define what "impaired" means either in Mississippi or Sweden, and there is no way for us to know if a living person while driving in Mississippi is "impaired" at 30 ng/mL as they are in Sweden – there is simply no data presented on this point.  Further, the relevance of "drivers in Sweden" being "impaired" at 30 ng/mL is not explained in light of the fact that the report has listed no concentration for Mrs. Lott while she was driving.  The report is thus comparing apples to oranges, i.e., samples taken from a living driver versus samples taken post-mortem from a deceased driver. The report does not posit a reliable method for determining that a "free 73 ng/mL" concentration post-mortem would equal or exceed 30 ng/mL prior to death, and therefore the impairment level in Swedish drivers is completely irrelevant.

Similarly, he lists the post-mortem concentration of clonazepam and its metabolite 7-Aminoclonazepam.  No effort is made to discuss the significance of the metabolite, 7-Aminoclonazepam, other than merely noting the post-mortem concentration, which is reason enough to strike any mention of it.  As to clonazepam itself, the report states that the usual therapeutic serum levels of clonazepam are 10 to 75 ng/mL, and that the "median

concentration of clonazepam in the blood of impaired drivers in a study from Sweden was 40 ng/mL."  However, no data is presented at all showing whether Donna Lott was above, below or within the therapeutic level or even at the level of impaired Swedish drivers.

**B.  The NHTSA report heavily relied upon by the toxicologist is misquoted in his report and simply does not support his conclusions.**

The toxicologist's report relies upon a finding by a NHTSA panel which is attached hereto as Exhibit 2.  The toxicologist selectively quotes the NHTSA as stating: "Severely impairing in acute situations if used orally, or as an intravenous medication, or if either drug is taken illicitly."  Exhibit 2 at 77.  The full quote from the NHTSA shows the toxicology report is misleading:

> ***Panel's Assessment of Driving Risks:*** <u>Classification of risk depends on tolerance, dose, time of exposure, acute or chronic use, presence or absence of underlying pain, physiological status of individual, and the presence of other drugs</u>. Moderately to severely impairing in non-tolerant individuals. Mild to moderately impairing if morphine is used as medication on a regular basis for chronic pain. Severely impairing in acute situations if used orally, or as an intravenous medication, or if either drug is taken illicitly.

Exhibit 2, NHTSA report at p. 77 (underlined emphasis added).  Thus the NHTSA panel was not positing that mere illicit use of morphine automatically means that the person using it is "severely impaired."  The panel made clear that the risk classification depends on at least seven different factors of which we are presented no data:

| FACTOR LISTED IN NHTSA REPORT | DATA USED BY TOXICOLOGIST RELATING TO NHTSA FACTORS |
|---|---|
| Tolerance | Despite obtaining Mrs. Lott's medical records defendant presents no data regarding her tolerance |
| Dose | Defendant presents no data regarding dosage |
| Time Of Exposure | Defendant presents no data regarding time of exposure |

| Acute Or Chronic Use | Defendant presents no data regarding whether Mrs. Lott's use was chronic or acute, nor is there any explanation of what the effect would be of chronic use vs. acute use |
| Presence Of Absence Of Underlying Pain | Defendant presents no data regarding the presence or absence of underlying pain |
| Physiological Status Of The Individual | Defendant presents no data regarding the physiological status of Mrs. Lott immediately prior to the collision |
| Presence Of Other Drugs | Defendant presents no data regarding the concentrations of other drugs immediately prior to the collision |

For example, the NHTSA report states that "Tolerance makes interpretation of blood or plasma morphine concentrations extremely difficult." Exhibit 2 at p. 74. The report goes on to say:  "**Effects:** Depends heavily on the dose of morphine or heroin, the route of administration, and previous exposure. Exhibit 2 at p. 75. The toxicologist's report presents no data on the dose of morphine, the route of administration or Mrs. Lott's previous exposure to morphine or even her tolerance to morphine.  Thus, even if we did have data showing what the concentration of morphine in her blood stream was at the time of the collision, we would still lack data that is essential to the analysis of the effects of that level of morphine.

"Consistently with *Kumho*, the Rule as amended provides that all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful. Consequently, the admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. See *Bourjaily v. United States*, 483 U.S. 171 (1987)."  Fed.R.Evid. 702, Committee Notes on Rules—2000 Amendment.  Clearly, the proponent of the toxicology testimony (the defendant) has not met his burden of showing that the evidence is both reliable and helpful.  As shown herein, the toxicologist ignores his own admission that he

cannot calculate the pre-death concentrations of the medications he lists, and he also distorts and misquotes the NHTSA panel report that he heavily relies upon.   The toxicologist's report (and thus his testimony) cannot be considered either reliable or helpful to the jury.

      **C.  The toxicologist's argument that merely using a medication "illicitly" automatically renders a driver "severely impaired" is illogical and certainly not based on any scientific test.**

The report attempts to use the NHTSA statement that morphine is "[s]everely impairing in acute situations if … taken illicitly" to argue that Mrs. Lott must have taken the drug illicitly, and that she was therefore "severely impaired" (without explaining the meaning of the term).   There is simply nothing in the NHTSA report or in the toxicology report that backs up this argument, which is absurd.   If this were the case, then the amount of morphine in a living person's blood is completely irrelevant if the person is using morphine illicitly.   Thus, a living person with .1 ng/mL would be "severely impaired" if she took the drug illicitly, while another person with much higher concentrations could be only "mildly impaired."   There is no data or evidence presented to suggest that the "x ng/mL" of morphine has any different physiological effect when taken illicitly than when taken licitly.   Again, the NHTSA statement was certainly taken well out of context, but if NHTSA *had* meant to imply that illicit vs. licit usage determines the level of severity, it clearly would not be a statement that the toxicologist could logically rely upon.

      **D.  The toxicology report admits that "Chlorpheniramine is expected to undergo postmortem redistribution," which means that all opinions regarding the effect of that medication on Mrs. Lott while she was driving are baseless speculation.**

As with morphine, all of the toxicologist's opinions with regard to chlorpheniramine are baseless and speculative because there is no data on the concentration

of this drug in her system while she was driving.  The report states that this over-the-counter antihistamine was found post-mortem, and that "[c]hlorpheniramine is expected to undergo postmortem redistribution."  Thus the report admits that there is no way of knowing what the concentrations of this drug was at the time of impact.  The report also states that "[t]herapeutic drug concentrations are between 3.0 ng/mL and 17 ng/mL," however there is no data presented on what concentration would cause Mrs. Lott to be "significantly impaired" by this drug, either alone or in combination with other drugs.

Likewise, the statement in the report that "[f]irst-generation antihistamines (including chlorpheniramine) significantly impair driving performance after one-time and repeated administration (Verster 2004, FDA 2013)" is also merely a general one and gives no data as to what dosage of chlorpheniramine is necessary to impair driving performance. The report further states that "[c]ombining antihistamines with alcohol or sedatives can seriously increase the sedative effects of antihistamines," however the autopsy showed no alcohol and we are given no indication of what "sedatives" the FDA was talking about. The statement from the FDA is also clearly a generalized conclusion lacking facts and hard data, and is not sufficiently precise to based conclusions upon.

> **E.  NHTSA states that "at recommended doses, dextromethorphan produces little or no CNS depression."  There is no data to suggest that Mrs. Lott was at a higher than recommended dose of dextromethorphan/cough syrup.**

As with each of the other drugs for which we are given post-mortem concentrations, the report provides absolutely no data on the concentration of cough syrup in Mrs. Lott's bloodstream at the time of the collision.  Because "[d]rug concentrations increase after death due to changes in blood pH and drugs redistributing from tissues to blood, a process known as postmortem redistribution," there is absolutely no way to determine the effects

of the unknown amount of cough syrup that was in her system when she was weaving on on the road.

The NHTSA panel stated: "***Effects***:   At recommended doses, dextromethorphan produces little or no CNS depression."   The report goes on to describe myriad adverse effects at higher doses, such as "doses of 200-500 mg produce a more intoxicating effect (likened to being 'drunk and stoned')…"   However, the toxicologist's report in this case tells us nothing about the dose of dextromethorphan that was taken by Mrs. Lott prior to the collision – that data is omitted.   There is evidence in the record that Mrs. Lott regularly took cough syrup that her husband had to sign for when picking it up at the drug store, which is consistent with therapeutic use at recommended doses; the toxicologist's report omits this fact, even though he did read Mr. Lott's deposition.[2]   The toxicologist's report also does nothing to tell us how many ng/mL of dextromethorphan in a living driver it takes to make the driver mildly, moderately or severely impaired – that data is also omitted, but of course that data would be useless anyway because we do not have any data reporting the how many ng/mL of dextromethorphan was in her bloodstream before the collision, and that data cannot be extrapolated from the post-mortem concentrations.

The NHTSA report states:  "Panel's Assessment of Driving Risks: Minimal to no risk at therapeutic levels. Potentially mild to moderate driving risk with higher recreational use."  The NHTSA report makes clear that "recreational use" involves higher doses than "therapeutic use."   However, no data is presented in the toxicologist's report telling us whether Mrs. Lott was using a therapeutic dose or some higher dose, because the toxicologist simply did not have that data to work with.

---

[2] Gary Lott dep. 24:9-14.  By failing to cite or discuss evidence relevant to this drug of which he was aware, the toxicologist was acting as an advocate, not a scientist.

It should also be noted that the NHTSA report discusses chlorpheniramine in the same section that it discusses dextromethorphan: "Products contain dextromethorphan alone or in combination with guaifenesin, brompheniramine, pseudoephedrine, phenylephrine, promethazine, codeine, acetaminophen, and/or chlorpheniramine." Exhibit 2 p. 25. The only other mention is in the discussion of dextromethorphan's side effect profile, which states that "chlorpheniramine and dextromethorphan can cause seizure, loss of consciousness and bleeding. Exhibit 2 p. 26-27. There is no separate discussion of chlorpheniramine's effects on driving in the NHTSA report. The toxicologist's discussion of chlorpheniramine contains the exact same deficiencies as his discussion of dextromethorphan – he admits that

He states that it has an additive effect with alcohol but there is no evidence of alcohol in Mrs. Lott's bloodstream, he lists the therapeutic drug concentration but lacks any data on whether Mrs. Lott was below, above or within that range, and admits that "[c]hlorpheniramine is expected to undergo postmortem redistribution." The toxicologist's report states that "First-generation antihistamines (including chlorpheniramine) significantly impair driving performance after one-time and repeated administration (Verster 2004, FDA 2013). Combining antihistamines with alcohol or sedatives can seriously increase the sedative effects of antihistamines (FDA 2013)," but the sources he relies upon merely state general conclusions; he submits no data showing what concentration of chlorpheniramine can (standing alone or in combination with other medications) is necessary to have caused Donna Lott to have weaved across the road.

**F.  The statement that all the medications found in her system have CNS depression properties and are individually capable of causing impaired driving are misleading and not helpful to the jury.**

We can thus show that the opinion "All the medications found in her system have

- 15 -

CNS depression properties and are individually capable of causing impaired driving" is not helpful to the jury because it infers that any dose of these medications at all – i.e., the mere presence of a detectable amount of the medication – was so dangerous that it automatically caused her to be impaired while driving. The sources that the toxicologist relied upon, particularly the NHTSA report that he heavily relied up, refute this contention.

The opinion that "The four medications found in Ms. Lott would interact to cause additive impairment of driving" is not backed up by sufficient data. The NHTSA report shows that the interactions of medications can cause impairment, but as discussed above also makes clear that there are a number of other factors to consider, such as the dose of each medication, tolerance to the medication and so on.

## IV.  THE TOXICOLOGIST ENGAGES IN A BLATANT LEGAL ARGUMENT BY STATING THAT MRS. LOTT WAS USING MORPHINE ILLICITLY.

The toxicologist stepped out of the shoes of a scientist and into the shoes of a legal advocate by arguing that Mrs. Lott must have been using morphine illicitly:

> Per the deposition of Ms. Lott's husband Gary Lott, Ms. Lott did not have any health problems other than hypertension. If this is true, Ms. Lott's use of morphine would have been an illicit use. The NHTSA concluded that when morphine is used illicitly, it is severely impairing.

Exhibit 1, report at p. 6. The toxicologist states this as a truism and fails to explain why this is so. The fact that Mr. Lott did not know of any health problems other than high blood pressure (hypertension) does not automatically mean that Ms. Lott was using morphine illicitly. This argument by the toxicologist shows that he is not acting as an expert, but an advocate, which is not an expert's role.

The report continues on and argues: "Even if not used illicitly, the combination of the quantities of morphine and other sedating drugs present in her system produced

- 16 -

significant impairment for operating an automobile."  However, the report presents no data whatsoever showing "the quantities of morphine and other sedating drugs present in her system" in the relevant time period, which is at the time of the collision.

As mentioned above, the report also reaches a legal conclusion that Mrs. Lott was "severely impaired for driving an automobile a the time of the motor vehicle collision…" If the toxicologist had reported the effects on Mrs. Lott of the various drugs, such as stating that the drugs made her dizzy, sleepy or lethargic, then he would have been within the realm of toxicology.[3]  However, whether someone is "severely impaired for driving" is a legal determination, not a toxicological one.   The report states:  "As a Toxicologist, I have been asked to evaluate the drug screens performed on blood obtained from Ms. Lott" and "I am commonly asked to interpret results of drug and alcohol tests."  Exhibit 1 p. 1. However, stating that Mrs. Lott was "severely impaired" at the time of the collision clearly is not backed up by drug screens he evaluated, and is not a valid opinion derived from interpreting the results of a drug test.  The toxicologist seeks to use "behavioral data" to back up his conclusions, but the authorities that he cites do not provide a basis for the way he uses the "behavioral data."  In short, he is not using toxicological methodologies in coming to his conclusions about Mrs. Lott's impairment from the medications that he cites, particularly when he also ignores the evidence of her hypertension and prior problems in driving due to hypertension.

## V.   WITHOUT MORE THAN CREDENTIALS AND A SUBJECTIVE OPINION, AN EXPERT'S TESTIMONY THAT 'IT IS SO' IS NOT ADMISSIBLE

The *Daubert* factors "are not mandatory or exclusive; the district court must decide

---

[3] Of course, in order to render opinions about the effects of the medications he would still need to meet other standards for admissibility.  As discussed herein, he did not meet evidentiary or *Daubert* standards.

whether the factors discussed in *Daubert* are appropriate, use them as a starting point, and then ascertain if other factors should be considered." *Id* (citing *Black* v. *Food Lion, Inc.,* 171 F.3d 308,311-12 (5th Cir. 1999)). However, "the existence of sufficient facts and a reliable methodology is in all instances mandatory." *Id.* "[W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."

The toxicologist's report is bereft of relevant data and rife with subjective opinions. The report relies entirely on a post-mortem analysis of Mrs. Lott's blood that the report admits is utterly incapable of showing what the pre-death levels of medications were in her bloodstream, and provides not scientifically valid method of showing what her level of driving impairment was at the time of the collision. There are not "sufficient facts" and there is no "reliable methodology" for making these determinations. While the toxicologist has credentials in the field of toxicology, he cannot simply say "she was severely impaired by these medications" without backing up his opinions with reliable data and a reliable methodology.

## VI.    THE TOXICOLOGIST'S OPINIONS EXCEED THOSE PERMITTED BY FED. R. EVID. 704 AND 403

The toxicologist's opinions tell the jury what conclusion it should reach, present dangers of unfair prejudice and confusion, and wastes the Court's time. The report reaches a legal conclusion that Mrs. Lott was "severely impaired for driving an automobile a the time of the motor vehicle collision…" If the toxicologist had reported the effects on Mrs. Lott of the various drugs, such as stating that the drugs made her dizzy, sleepy or lethargic, then he would have been within the realm of toxicology.[4]  However, whether someone is

---

[4] Of course, in order to render opinions about the effects of the medications he would still need to meet other standards for admissibility.  As discussed herein, he did not meet evidentiary or *Daubert* standards.

"severely impaired for driving" is a legal determination, not a toxicological one.

Although "Federal Rules of Evidence 704 'abolishes the per se rule against testimony regarding ultimate issues of fact,' neither it nor Rule 702 permit an expert to testify as to legal conclusion or to offer' evidence which wastes time,' such as 'opinions which would merely tell the jury what result to reach. '" *Shoemake* v. *Rental Service Corp.,* Civil Action No.1 :06cv426-HSO-JRM, 2008 U.S. Dist. LEXIS 9240, at *5 (S.D. Miss. Jan. 22, 2008). As noted in the Advisory Committee Notes to Rule 704:

> The abolition of the ultimate issue rule does not lower the bar so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact. . . . These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day.

*See also Owen* v. *Kerr-McGee Corp.,* 698 F.2d 236,239 (5th Cir. 1983). An expert who merely tells the jury what conclusion it should reach both fails to assist the trier of fact and invades the court's province in instructing the jury on the law. *Id* at 239; *Torres* v. *County of Oakland,* 758 F.2d 147, 150 (6th Cir. 1985) ("The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury. This 'invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law.")

If Donna Lott was "severely impaired" due to the medications in her system but not negligently intoxicated at the time of the collision, then there is no basis for holding her liable for the collision. "The mere fact that the operator of a motor vehicle who was involved in an accident was intoxicated does not render him liable for damages resulting therefrom, or bar him from recovering, or diminish his recovery, for his own injuries

sustained in such accident where it does not appear that his condition was the proximate cause of the accident or that it occurred by reason of any negligence on his part." 7A Am.Jur. 2d, Automobiles and Highway Traffic sec. 775. Defendants know that they must prove that Donna Lott was intoxicated from the drugs in her system at the time that she was killed, and that she <u>negligently</u> became intoxicated, else there will be no negligence on her part. This is the reason why the report highlights the presence of a morphine which, although a prescription drug, certainly has an "illicit" aura. Regardless, it is not the role of the toxicologist to opine that Mrs. Lott's use of any drug was either "illicit" or negligent. In doing so, the report strays into advocacy and presents legal conclusions.

## VII.    THE REPORT VIOLATES RULE 403.

Rule 403 of the Federal Rules of Evidence provides another guard against impermissible legal conclusions offered by an expert, as it requires the exclusion even of relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403; *see also* FED. R. EVID. 704, Advisory Committee Notes. Since juries tend to accept the testimony of an expert witness as true, the concerns which underlie Rule 403 are heightened in the context of expert testimony. The Supreme Court recognized as much in *Daubert,* quoting Judge Weinstein's admonition that expert evidence "can be both powerful and misleading because of the difficulty in evaluating it" and poses a risk which requires the trial judge, when weighing possible prejudice against probative force under Rule 403, to exercise more control over it. *Daubert,* 509 U.S. at 595.

Rule 403 is a balancing test. In this case, on one side of the see-saw is the very

- 20 -

non-existent probative value of the post-mortem concentrations of medicines found in Mrs. Lott's blood samples.  On the other side sits an enormous weight of prejudice.  First, how can the jury be anything but misled by the fact that the post-mortem analysis shows any amount of the listed medications?   The toxicologist will testify that any of these medications alone could cause "a driver" to be impaired, which is severely misleading without also telling the jury exactly what concentrations would cause Donna Lott to have been impaired.  The toxicologist will also testify that there is an additive effect of having more than one medication in one's bloodstream, which is severely misleading since he provides no data on what the effects would be for Donna Lott at any given concentration of the medications that were in her system.  Of course, all of his testimony is misleading since he admits that the concentrations found in a blood sample have been affected by post-mortem redistribution, and therefore post-mortem concentrations cannot be correlated to the concentrations at the time of the collision, which is the only relevant time period.

VIII.    **EVIDENCE REGARDING PRESENCE OF ANY MEDICATION IN DONNA LOTT'S BLOODSTREAM (OTHER THAN HYPERTENSION MEDICATION) MUST BE EXCLUDED.**

If Donna Lott was "severely impaired" due to the medications in her system but not negligently intoxicated at the time of the collision, then there is no basis for holding her liable for the collision.  "The mere fact that the operator of a motor vehicle who was involved in an accident was intoxicated does not render him liable for damages resulting therefrom, or bar him from recovering, or diminish his recovery, for his own injuries sustained in such accident where it does not appear that his condition was the proximate cause of the accident or that it occurred by reason of any negligence on his part."  7A Am.Jur. 2d, Automobiles and Highway Traffic sec. 775.  Defendants know that they must

prove that Donna Lott was intoxicated from the drugs in her system at the time that she was killed, and that she <u>negligently</u> became intoxicated, else there will be no negligence on her part.  This is the reason why the report highlights the presence of a morphine which, although a prescription drug, certainly has an "illicit" aura.  Regardless, it is not the role of the toxicologist to opine that Mrs. Lott's use of any drug was either "illicit" or negligent. In doing so, the report strays into advocacy and presents legal conclusions.

Plaintiff therefore also specifically moves that all evidence concerning the presence of any medication other than blood pressure medication be excluded.  Unless the defendant can show that these medications caused her to be intoxicated to the point that she was weaving across the roadway, it has no relevancy at all but would be highly prejudicial. Since the toxicology report fails to show that she was at all intoxicated due to these medications, and also fails to show that the medications caused her to drive in the manner that she did, it is irrelevant and prejudicial and must therefore be excluded under the rules of evidence and court decisions discussed herein.

WHEREFORE, plaintiff requests an order from the court providing the relief herein requested.  Respectfully submitted May 26, 2017.

**LEE LAW FIRM, LLC**

By:   /s/ K. Douglas Lee
        K. Douglas Lee, MSB# 9887
        628 Churchwell Road
        Hattiesburg, MS 39401
        Phone: (601) 583-4447
        Fax: (601) 450-0152
        doug.lee@leelaw.us
        Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I, K. Douglas Lee, attorney for plaintiff, do hereby certify that on <u>Friday, May 26, 2017</u>, the undersigned person sent the foregoing to the following people via ECF:

Maison Heidelberg
WATSON HEIDELBERG JONES PLLC
2829 Lakeland Drive, Suite 1502
Flowood, Mississippi 39232
P.O. Box 23546
Jackson, Mississippi 39225-3546

By:   /s/ K. Douglas Lee
Attorney for Plaintiff